The Court now calls 117083, Grand Chapter, Order of the Eastern Star of the State of Illinois, Appley v. Judy Bart Topinka as Treasurer of the State of Illinois at all. Appellants, are the parties ready to proceed? Yes, Your Honor. You may proceed. Good morning, and may it please the Court. Good morning. I'm Assistant Attorney General Evan Siegel here on behalf of the State Treasurer and the Director of the Department of Health Care and Family Services. Your Honor, the bed fee imposed against Plaintiff Grand Chapter under Section 5e of the Public Aid Code is reasonable and passes muster under the Court's uniformity standards. And beyond that, the three main reasons that the Circuit Court provided for declaring the provision unconstitutional don't stand up to scrutiny. As to the first point, there's a baseline principle at stake here, and that is that statutes are presumed constitutional under the uniformity clause. The General Assembly enjoys broad discretion when classifying different groups of taxpayers. That's just fundamental uniformity law. And as a consequence, this Court's review of statutes challenged under the uniformity clause is deferential. And even if a court decides that it might decide to draw the lines differently or more logically, the Court still defers to the way that the legislature, through the categorization, unless there's no reasonable basis for the statute. So to prevail here, Grand Chapter must meet the heavy burden of showing that neither the facts nor the law support the bed fee, that the fee is not reasonable or fair. By contrast, all the state has to show are that the facts can be reasonably conceived to sustain classification. And in this regard, the analysis is very similar to this Court's approach when it considers whether a statute has a rational basis under the due process clause. They're very similar analyses. So if the statutory basis is not arbitrary, and that's a very easy bar to clear, there can be no further inquiry into the legislative purpose. And here, the bed fee very much is a reasonable statute because it serves a legitimate function and purpose by supporting this state's indigent and at-risk populations in the area of health care and elsewhere. It fosters the health and well-being of all of the state's citizens. Just to put some facts and figures neat on the bones for the Court's context, the bed fee contributes in the years in the record, we have 2011 and 2012, about $50 million each year to something called the Long-Term Care Provider Fund, which appears under a different provision. And the Long-Term Care Provider Fund, as I'll explain in a moment, funds a variety of different state functions. But in 2011, the Long-Term Care Provider Fund amounted to $650 million. $50 million of that came from the bed fee, and $557 million was directed to my client, the Department of Health Care and Family Services. Another $2 million went to an agency that's not a party here, the Department of Public Health, which licenses all nursing homes in the state, including Grand Chapter. And the numbers are quite similar in 2012, the other year that we have here. About $50 million from the bed fee into the Long-Term Care Provider Fund, which provided money to both of those two agencies, my client and the Department of Public Health. So Grand Chapter is indeed a nursing home that's part of a larger nursing home system in this state that's regulated by state agencies and that benefits from expansions and improvements to regulatory provisions and licensing as well. So in this very elementary way, Grand Chapter does benefit from the bed fee, even though, and I want to emphasize this, none of this court's precedents require, in the uniformity field, that Grand Chapter benefit directly from the bed fee. So what we have is a rational statute, and that's enough to pass muster on the uniformity clause. Remarkably, however, the circuit court did not consider that primary analysis at all. And instead, it offered three distinct reasons for turning over the statute for, I'm sorry, for declaring it unconstitutional as applied to Grand Chapter. And these are three distinct fatal flaws, each of which gives this court ample reason to reverse the circuit court. The first one is this. The court reasoned Grand Chapter's urging that there has to be, that the uniformity clause dictates that there must be some sort of quid pro quo funding or financing from a taxpayer to where the revenues are directed, guaranteeing some return to the paying entity for every dollar that's paid. And this ground alone merits this court's reversal. The second reason for overturning the circuit court's decision is that the court decided, again, incorrectly, based on this fundamentally flawed principle about the uniformity law, that the long-term care provider fund supports Medicaid alone, which we all stipulate Grand Chapter doesn't receive a dollar because it's a paternal organization. Which makes it unique among nursing homes. The third reason, a suggestion by the circuit court that's there in its decision and findings, that Grand Chapter's exempt from the bed fee because it's a charity. Now, that's a legal conclusion that's not in the record, and it's not factually shown in the record either. It's irrelevant. Now, I'd like to start with the first critical flaw about how the uniformity clause requires some sort of harm that an entity caused to justify taxing it, a burden that it must bear, or the idea that there must be a dollar, virtually a dollar, in return for every dollar that a taxpayer pays. In fact, just the opposite is true under this court's longstanding uniformity cases. This court's decisions on uniformity, which the circuit court really didn't get into in any detail except for one case, makes clear that a small group of taxpayers can be required to subsidize a larger group or a different group or the general welfare of the public at large. By the same token, there's no uniformity violation when one segment of the population funds a different one. So, Mr. Siegel, is this tax more like a tax for general welfare programs or more like a fee imposed for specific services? Well, I think it's more like a focused fee or a limited general revenue raiser because the money that's raised from the bed fee that goes into the fund, Your Honor, funds much more than just Medicaid, which is the principle at the center of the circuit court's decision. There are at least half a dozen different areas that the fund directs monies to that are not Medicaid-related, and those include funding the general welfare and obligation fund of the state, retirement funds, background checks for employees that work in the nursing home field, and the development of programs and standards that regulate health care at large, an ombudsman program as well. So not all of these have to do with Medicaid, but it is called in the statute a fee. So there's no problem under uniformity when an entire segment of society benefits even though it didn't pay the tax, and that stands to reason. That's logical. Schoolchildren, to take just one example, benefit greatly demonstrably from different state programs, including a very important program that my client operates, child support services, which is not Medicaid-related but has to do with ensuring that children who are from impoverished backgrounds or just any background have received support from both parents when there's a separation in the family. But schoolchildren, of course, don't pay taxes. Their neighbors do. And under Grant Chapter's theory of taxation, uniformity would be violated when a retiree pays a portion of her taxes to fund programs for the state's youth. And that is why Grant Chapter claimed here that the Circuit Court held that because the sole purpose of the bed fee is to underwrite Medicaid reimbursements, Grant Chapter shouldn't have to pay any amount. That doesn't make any sense. We all pay taxes for things that don't benefit us directly or indirectly, including, of course, Medicaid itself. So the Circuit Court's theory, its underlying premise, can't be squared with this Court's decisions in cases like Allegro and Aaronville and Amherst. Now, and the state's tax, it's important to emphasize that if that theory were to hold, the state's taxing scheme would collapse. We couldn't have a use tax or a service use tax or a retailer's occupation tax because those taxes look at very particular categories, specific sales funds, and then direct the funds into special funds that don't necessarily go to benefit, say, hotel operators who pass the tax on to their customers. Now, what accounts for the Circuit Court's outcome here appears to be a total reliance on this Court's decision in Prime Co. But that case can be distinguished and was misread by the Circuit Court. And the essential distinction that I'd like to draw is this. In Prime Co., this Court found a uniformity violation because dissimilar entities were being treated similarly. And we are talking here about telecommunication companies. Cellular companies were the plaintiffs. But they were lumped in together with landline operators. And the cellular companies had to pay what was called a municipal infrastructure maintenance fee. The problem that this Court correctly discerned was that there was a wrongful quid pro quo. The cellular company had to pay this infrastructure fee to access public rights of way. But it didn't rely exclusively on what was on those rights of way, which involved traditional elements of telecommunications companies, switches and manhole covers, cables to complete landline calls. There was no rationale for the landline companies to have those elements. They relied largely on cell phone towers. So the plaintiff, the cellular company, was erroneously grouped with the landline companies. And this did not must pass muster under the reasonableness analysis of the uniformity decisions. But it doesn't follow from that decision that Grand Chapter is exempt from paying the bed fee here because Grand Chapter is not at all like a cellular company in prime code cellular companies. It is fundamentally and functionally very similar, identical nearly, to other nursing home entities in the system. There's nothing in the record, for instance, to demonstrate how there's a special or unique way that services are provided to the residents at the Eastern Star Home in a fraternal organization type of way, whether it be food or housing or activities or programs. There's nothing to suggest any difference. So there's really no material difference between this nursing home or any other that is licensed by the state. The key difference appears to be that the 22 or so residents of the Grand Chapter home all have to be members of that association, women who are selected by the board of directors. And, of course, there's the Medicaid difference. But that's not a material distinction to justify exempting this entity from the bed fee. So, in short, the circuit court's total reliance on prime code cannot be the basis of its decision to, given the fundamental similarity of Grand Chapter to other nursing homes in the system. And, therefore, the guiding principle of this court's decision is on uniformity, that some may be taxed for the benefit of the many, requires this court to reverse the circuit court's decision. Now, the second reason that the circuit court was wrong we touched upon briefly, and it's the idea that the bed fee here wholly supports Medicaid. That is factually correct, incorrect rather. But it's the entire basis of Grand Chapter's argument, and the circuit court did base its decision on that reasoning. There are two problems here. The first one is legal. The use of tax proceeds under a line of this court's decision, that is where the funds go, ordinarily bears no relevance to uniformity analysis. And that's the Perissotis Realta Theater Corps decision versus City of Peoria, which cites an earlier case called Board of Library Directors of Westmerefield Township. So that forecloses Grand Chapter's argument on this point under at least one line of cases. We don't look and see where the money's even directed. Secondly, it's not true. The facts don't show that Medicaid is the sole purpose of the bed fee. As I mentioned earlier, the long-term $50 million is paid into the fund in each of two years, and it goes to a multiplicity of different places. There are at least half a dozen examples that the statute provides in 305 ILCS 5-5B8, explaining how the funds help support the state's indigent programs. And that includes, importantly, the operations and salaries and pensions and insurance benefits of the employees of the Department of Health Care and Family Services, as well as the Department of Public Health. As I mentioned earlier in response to Justice Brooks' question, some of those funds go to the general interest and bond retirement fund, not Medicaid, the background factors I mentioned. So in other words, it's not just for Medicaid-related purposes. So Grant Chapter's argument that the bed fee funds only Medicaid is incorrect, as a matter of fact, even if it matters legally. And it doesn't matter legally under this Court's decisions in Allegro and Empress and Erringold. Finally, the third reason that the circuit court provided or suggested for finding the provision unconstitutional is the mistaken idea that charities are exempt from the bed fee. They are not, under the plain language of Section 5E, or any other provision that I've seen under Article 5E of the Public Aid Code. And to the extent that Grant Chapter is making an argument about a statutory problem and not a constitutional one, there are additional layers of problems. This Court has held in the Trent v. Willingham case that if a statute is stricken down as unconstitutional in a circuit court and there's a statutory basis for that and a constitutional basis, then it lacks jurisdiction to hear the 302A appeal. And beyond that, if Grant Chapter is suggesting an argument on the basis of equity, the proper place to make that argument is at the General Assembly, because there's nothing in the statute that is currently written that treats it differently from any other nursing home. So in short, Your Honors, the bed fee is reasonable, and the circuit court's decision departs from this Court's longstanding uniformity decisions. For those reasons, we would ask this Court to reverse the circuit. Thank you. Thank you, Counsel. May it please the Court? Counsel? My name is Darrell Willems. I represent the FLE. First, I'd like to state that when I make reference to the Department, I'm making reference to the Department of Health Care and Family Service, as opposed to the Department of Public Health. And when I say Eastern Star, I'm referring to the corporate entity, Grant Chapter, or the Eastern Star. The Eastern Star is probably an unfamiliar organization to most people in this courtroom. It's a charitable and fraternal organization that was incorporated in Illinois in 1885. They have been providing nursing home care for indigent women since the late 1800s. In the last 120 years, they've provided care for thousands of indigent people. The question of whether they are a charity or not has been raised. A charity has been defined in the dictionary as an entity that dispenses relief to the poor. So clearly, the Eastern Star is a charity. They do not operate at a profit, and they operate on donations. They have absolutely no revenue stream at all. All the money for the operation of this home, the net funds come from donations. There is some private pay residents in the home. Their care is provided for at half cost. The Eastern Star pays the other half, so they're not making one penny on anyone. Between 2000 and 2011, the Eastern Star contributed $28 million to care for indigent women. They are spending approximately $2 million-some-odd every year to provide care for indigent women. Most of the women at the home are there under what are called life care contracts. They contribute whatever assets they have when they enter the home to the Eastern Star, and in return, the Eastern Star contributes or provides for their lifetime care. It's uncontroverted, though, that almost all of the women who enter the home are indigent when they enter the home. The other thing that needs to be kept in mind about the Eastern Star is that they have absolutely no connection to the department. The department does not control them, regulate them, inspect them, license them. The department has absolutely no connection with the Eastern Star. Contrary to what counsel has argued, that money is being expended because of the Eastern Star, the record shows that not one penny of this money is expended because of the Eastern Star. Not one penny. The defendants were represented by skillful counsel in the lower court. He's in the courtroom today, and he tried his best to show some connection between the money that is raised in the bed tax and the Eastern Star, and he could not do it because there is none. They do not investigate them. There's no money used from these funds for any reason or purpose that affects the Eastern Star home. That's true. Is there any thing in the statute that would indicate that charities are exempt? Yes. And what is it? In the statute itself, the only nursing home providers that can be taxed are those who charge for the care. They have to charge. And there's a reason for that language, which I will get into. This whole case, first of all, we are not arguing with the legislature's classification and the creation of this statute. This is an as-applied argument. Our argument is with the department. We don't think they have the authority to assess this tax against the Eastern Star, and I think I can clearly demonstrate that. The whole statutory scheme, the purpose of it is to bring down funding for Medicaid. Initially in the state of Illinois, in the federal government, there was very little oversight how states provided the matching funds that are required for Medicare. This case is all about those matching funds. Where do they come from and how does the state get them? Does both your argument and the trial court's reasoning rest on the premise that the sole purpose of the bed fee is the reimbursement of providers who participate in the Medicaid programs? No, I don't think that's accurate. I don't think that's accurate. That was the premise, though, right, in the trial court case? Yes, yes, yes. And you heard opposing counsel talk about 5B-8. Doesn't that portion of the statute make clear that the reimbursement of Medicaid providers is only one of the bed fees' many purposes? That's what the long-term provider fund statute says, but if you look at the findings of the legislature when they enacted this law. Well, if that's what it says, do we go past that? I think you look at the findings. Isn't that the plain reading of the statute? That is the plain reading of the statute, but the legislature stated when they enacted that statute that the purpose of this law was to provide Medicaid funding, period, nothing else. That's the point. Well, if you were here for the last case, you heard the Chief Justice talk about what we do here extends past here. How would we not do violence to statutory construction principles if we avoid the plain reading of the statute? I don't think there's any violation if you do that. I'm not asking you to do that, to avoid the plain reading of the statute. What I will argue, though, is that those expenditures have absolutely nothing to do with the Eastern Star. There's no connection of any kind. You could go through that long list, which we went through this in the trial court. You can go through that long list, and if you look at the record, you will find that not one penny from this fund is being spent for any purpose that has anything to do with the Eastern Star. So as I understand your argument, then, is initially you said to look to where the legislature was going, and it had to do with Medicaid. But even if we look at the plain reading, you're saying the other list of purposes does not affect your client. That's correct. But, of course, Medicaid is woefully underfunded, and to think that they have money to spend on other purposes is a fallacy. The whole idea of this exercise is to raise those matching funds, which the state's desperately trying to do. The initial statute that the state of Illinois used was in Public Act 87-13, and that provided for a 15% tax on the gross receipts of a provider. But the provider had to be providing nursing home care pursuant to the Social Security Act, so the Eastern Star was not taxed under that scheme. Can I ask counsel, I don't want to lose this point where we were at, that I know the state's position, as we've already been talking about, is only one of the purposes, the reimbursement of Medicaid. They make the claim, and I want your response to it, since you're not going to have another chance to get up here, and I'm sure this is what we're going to hear from opposing counsel. They make the claim that several of the purposes, you said none, they said several implicate grand chapter, including payments to county-operated nursing homes, the payment of IDPH's administrative expenses, helping to fund the general obligation bond, retirement and interest fund, and underwriting the general enforcement of nursing home standards, the nursing home ombudsman program, and various efforts to expand home and community-based services. None of those apply. I do not think they do. Not to the Eastern Star they don't. None of those. Would you agree that if we disagree, and that one or more of those apply, that takes Prime Co. off the table? No. I would say it doesn't, because Prime Co. says, you look at the purpose of the legislation. What is the purpose? To decide whether the classification is reasonable. And clearly the purpose of this legislation is to raise those matching funds. That's what the legislature said. That's not what I'm saying. And that's what reality is, is that the legislature is trying to raise matching funds so that they can get money from the federal government. Mr. Willems, just to follow up on Justice Thomas, why do you say the nursing home standards do not apply to Eastern Star? Because they are regulated by standards that are created by the Department of Public Health, not the Department. Well, then let me back up and rephrase my question. Maybe I didn't hear Mr. Siegel correctly, but I thought he argued that the promulgation of these standards are supported by the funding base that this nursing bed fee establishes. And the second thing I heard him say, and I've read this two different ways, that's why I'm not clear about it, something about reimbursement for background checks on employees that may have been offenders? Yes, they argued that in the trial court too. But those two categories, nursing home standards and the background checks? The Department of Public Health, the Department of Health Care and Family Service, creates no standards that affects Eastern Star. But I think the question is, and maybe I'm not understanding you, but the question is whether or not the nursing bed fee goes into a fund that supports those activities. He argued that, but I have not seen any evidence demonstrating that that actually happens. And as far as criminal background checks, criminal background checks that the Eastern Star is subject to are paid for by the Eastern Star. They have to pay for them. In his brief, he's argued that you're eligible to get reimbursements. That's not accurate. Assume you're saying you don't get reimbursements. We do not get any reimbursements. You don't seek reimbursements. Even if we did, we couldn't. I'm going to get into this, but the federal law is what actually controls how the state of Illinois secures these matching funds. And the council has not even made reference to that. After this 15 percent tax was enacted, Congress almost immediately enacted public law 102-234, which is 43 U.S.C. 1396B. That's part of the Social Security Act. It's under title Roman numeral 19. This federal law dictates who the state can tax and how they can tax them. And the state of Illinois immediately recognized that they had a problem with their existing law, and they then repealed that law and enacted another funding mechanism, 87-861. And then the next year they enacted this legislation, 88-88 in 1993. And these new taxes, these new structures are attempts to comply with federal law. In federal law, this is not done in isolation. The state submits their proposal to the Center for Medicare and Medicaid Services. They review it to see if it complies with 1396B, and then they enter into a written contract. So the state funding mechanism has to comply with this federal law, and that's important because the federal government dictates who you can raise the matching funds from, and you can only raise matching funds from a provider that is being paid for the service. Mr. Williams, I'm trying to anticipate some of the replies based on some of the arguments, initial arguments by Mr. Siegel. Mr. Siegel is probably saying, if you're going to make my argument, just don't lose it for me, right? But I think that I heard Mr. Siegel indicate, back to the purposes, because, you know, we're off of the fact that it's only if we believe there are other purposes other than Medicaid. You're saying those purposes don't help Grant Chapter anyway. What authority do you have to say that even if they don't somehow apply to Grant Chapter, that Grant Chapter isn't liable for the tax? And I guess by analogy, right, I mean you might send your kids to private school, and you're going to get your property tax bill, and you can't opt out of the tax for the public school district, right? Correct. So what authority would there be in this case if we agree with you that the interest fund and the IDPH administrative expenses, all those purposes that are outlined in the plain reading, don't necessarily benefit the whole quid pro quo idea that you're then not liable for the tax? Okay, the answer to that is this, that the legislature has created a very narrow class to fund a general welfare fund. It's a general welfare tax. It's a very small class. When the legislature does that, the classification is essential, and the members of that class have to have some kind of connection to the purpose. And if there is absolutely no connection, the class members either cause the problem, benefit from the taxation somehow, there has to be some connection when you take a small class to fund a general welfare program. The Supreme Court of Illinois, that's always been the law, and that is a subject classification when you're using just a small group of people. And in this instance, they're taxing Eastern Star, who has absolutely no connection. They don't cause the problem, and they receive absolutely no benefit. And in fact, they alleviate the problem. These women that they're caring for would otherwise be on Medicaid, so they not only do not cause the problem, they're providing care for indigent people. And the fact that they have chosen just a small group, there has to be some kind of connection. And there's something further about this that's almost incredible, in that the federal statute says that they tell you what kind of taxes you can raise, and one of them is a bed tax. The other one is a revenue tax, a base point revenue. Of course, if they did that, we wouldn't be subject to a tax. But there's also a provision in the federal law, this 1936B, that says you can't be reimbursed. You can't be reimbursed for this bed tax. They take it away, and then later they say, oh, yeah, but you can be reimbursed if the state is meeting certain tests. So these Medicaid providers who pay this bed tax receive a 3% reimbursement over the normal compensation for care. And so there is a safe harbor created in the regulations so that the bed tax is refunded to the Medicaid nursing home. So the for-profit nursing home is getting refunded, and the charity is paying the tax, but cannot get it refunded. They are taking money from a charity to subsidize a for-profit business. Although it seemed to me the thrust of your argument in the briefs was that you received no benefits of Medicaid or anything else, you alluded early in your argument that you would not be included within the term nursing home provider because you don't charge its residents. Clarify for me, though. It seemed to me the facts were that if a person had some assets, they had to surrender their assets in exchange for lifetime care, or if they were able, they might pay it half the rate. Is that true? Is that not charging? Well, that is charging, but it's not charging for the purposes. Charging means that you're being compensated for providing that bed. And what they are doing here is they are taxing the very act of charity, and that is to provide a bed to somebody who doesn't have the money to pay for it. They are actually taxing the act, not taxing a charity, but the act of charity. And I don't think there's any precedence for that. In any law in this state where money is taken for the act of charity and given to a for-profit business to pay, this is a statute. Sometimes this court comes to a case like this, and it's fairly difficult to analyze it in a logical fashion. Sometimes this court has said that the classification is absurd, shocks the conscience, and there's a famous old Supreme Court case where. . . Counsel, your time has elapsed. Okay. Thank you. Mr. Williams, if I may, the nursing home reimbursement, was that Section 1936? Is that what you said? It's Section 1936B, capital B. Okay. And the heart of it is under subparagraph small w in parens. Okay. Thank you. Thank you. I want to clarify a couple of things. It may not have been clear when I was up here before to correct some of the things the counsel has said. Let's talk about the charitable exemption. He's asking for the creation of a charitable exemption where none exists. That is his argument. It is purely statutory, and this court does not have jurisdiction to hear this appeal on that basis. It's a mandate to the Supreme Court, and the argument should be made in the legislature to create a charitable exemption.  They don't really charge any fees because there is a loss. We don't have a lot in the record. We have nothing in the record about loss. We know that there is some sort of fee for service because you have to surrender your assets or pay on a monthly basis. But under this court's decisions in the area of charitable exemption, charitable exemptions for hospitals and for nursing homes, that's just not the end of the analysis. That's the beginning. This court's decisions in the area of property tax exemptions go into great detail about funding mechanisms, payment mechanisms, and whether services are at a loss or at cost. We don't have any information on that here. We don't have anything showing that there's even a certificate for sales tax exemption here. We don't know if they pay property tax, but even if they are charitable, based on what counsel has put into the record, there's no exemption here, and they're making a statutory argument. The claim that not one penny from the fund benefits a branch after is, again, legally irrelevant because of this court's decisions and Aaron Gold and other cases. They don't have to create a problem that needs to be remedied, and they don't have to benefit either. The taxing class is not narrow. We're talking about every nursing home in this state which pays $50 million a year in total. In the grand chapter's brief and in the discussion we heard earlier, there's a lot of talk about Medicaid funding. That is not the statutory provision that's at issue. We're talking about Section 5E of the Public Aid Code, which describes how the nursing fee works. And what is more, the grand chapter conceded in the circuit court, in page C280 of the record, that Section 5B, the Medicaid provision, is not at issue. So I don't know why we're talking about it, but if we are talking about it, on page 13 of their brief in this court, at the bottom of the page, there's a citation of 305 ILCS 35-1-29, and this talks about federal matching funds and how they may be raised from a broad base. A broad base. Every nursing home. Including, presumably, as the statute shows, ones that are associated with fraternal organizations. Now, further as to the connection, which doesn't matter, again, legally, between where the money comes from and where it goes, the grand chapter has said that not one penny of the funds raised are connected in some way. That is not shown by the record. As we show at pages 15 and 16 of our opening brief, $2 million of the fund goes to fund the licensing operations of the Department of Public Health. This is a licensed entity. Licensed, I think they would concede, by the Department of Public Health. So right there with that agency, not the Department of Health Care and Family Services, but the Department of Public Health, the licensing operations benefit grand chapter because it is licensed, and because it operates in a marketplace where improper or improper homes or bad actor homes are not its competitors down the street. Licensing serves an important purpose. Now, just to clarify something that you asked about, Justice Kilbride, there is no direct reimbursement under this mechanism to grand chapter. That is correct. What we argued is that, and it is conceptual, to be sure, grand chapter operates in a system of nursing homes. It benefits from an efficient system of health care even larger than just nursing homes. The state's funding of programs that benefit the indigent and the at-risk mean that they have the health care that they need and the life skills and the health to continue to be self-sufficient, and that come the time when they're not able to care for themselves, our nursing home system is not burdened even greater than it already is with people who can't afford to pay for their health care. It benefits as well from my client, the Department of Health Care and Family Services, overseeing the statutory and regulatory provisions that are mentioned in Section 5B, which we talked about earlier, that provide ongoing oversight and regulation and development of the public health care system in the U.S. Justice Thomas, you asked if it's appropriate to go beyond the legislative finding. We don't even have to talk about the legislative finding, as a matter of fact, because under rational basis analysis, the state merely has to provide a reason for the statute that's not arbitrary, and we have. Helping the indigent and at risk is a good thing, regardless of whether one nursing home or many or a broad base pays for it. But it doesn't have to be evidentiary reasons. We're not under a criminal standard of review or burden of proof to justify every facet of a statute. It's enough that there's a rational reason for it. Again, there is no connection required. I can't emphasize that enough. It doesn't have to be a problem that Grand Chapter created or a solution that they provided. In this court's Allegro decision, there was a tax placed on taxi cabs and limousine services that were not allowed to go to take passengers from O'Hare or Midway to McCormick Place. They only shuttled them and ferried them to the suburbs. They were not going to benefit or create a problem by depositing too many tourists at McCormick Place, and yet this court held that it was reasonable and rational to tax that class of limousine and taxi providers because they were part of an overarching, larger transit system that was going to benefit from the development of McCormick Place wherever they delivered their passengers to. So this idea, again, of the connection is based on an incorrect reading of the law. If the court has no further questions, we would ask that you reverse the circuit court. Thank you. No. Case number 117083, Grand Chapter Order of the Eastern Star of the State of Illinois versus Judy Bartopinka as Treasurer of the State of Illinois will be taken under advisement as Agenda Number 10. Thank you, Mr. Siegel and Mr. Willems, for your argument. You're excused at this time.